Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. I have the privilege of representing the appellants, South Bay Pentecostal Church, and their pastor, Bishop Mark Hodges. At the outset, since I understand I have 30 minutes, I'd like to reserve 10 minutes for rebuttal, if I may. You may, and please watch your clock. Yes, Your Honor. Thank you. South Bay Pentecostal Church is a diverse religious community in San Diego County. Pastor Mark Hodges has been the pastor there for some 35 years. As such, he's taking great care during this pandemic to make sure all the safety protocols have been fully implemented and practiced for the prevention of COVID-19 being spread. That includes not just social distancing and wearing masks, but also having full sanitation protocols. They have people reserved in advance. They use screens and gloves. That's appropriate. They make sure they have full ventilation. In fact, he takes great pride in saying his church is the safest place in San Diego because everything they do, people even approach the altar when necessary, in one line, socially distance, and leave in another line, socially distance, unlike a lot of places where there's secular activities where people are mingling about, going back and forth. They are required to worship in church, Your Honors, according to their discipline. They are required to be present in the sanctuary where their altar is located and where their baptistry is located. They do not have a facility to be worshiping outdoors, so for them, bar and indoor worship services is a complete bar for their ability to practice their faith. As the court is aware, in Calvary Chapel, a different panel of the Ninth Circuit actually made the statement that the United States Supreme Court decision in November in the Brooklyn Diocese case was a seismic shift in pre-exercise law. Based on that seismic shift in the controlling authority presented by the Brooklyn Diocese case and recognized by the Ninth Circuit in Calvary Chapel, it's our position, Your Honors, that that's binding authority on this court, which means strict scrutiny does need to be applied as recognized by the district court and as articulated in the Church of the CUNY United States Supreme Court decision, and it also means applying the very same comparators that the United States Supreme Court applied and Calvary Chapel Ninth Circuit panel applied under strict scrutiny, which in this case, because California's regime is different from that of the Supreme Court address in Diocese of Brooklyn and also is distinguishable from the one in Dayton Valley in a myriad of ways. I guess predominantly California here assesses the level of capacity by weighing the transmission risk of each individual enterprise. So to what group of entities do you think the church should be compared? Because if you look at this chart, many venues that are similar to a church, which would hold a large number of people, are actually closed under both regional and Tier 1 of widespread. So I'm really curious, which venues do you think that we should be, for purposes of determining neutrality and general application, do you think we should be comparing the church to the essential critical infrastructure categories or to similar categories like concert halls, museums, zoos, aquariums? Thank you, Your Honor, for the question because it does go to the heart of the analysis and it's our position, I believe, well supported by Brooklyn diocese that churches, regardless of what color coded category the state may wish to place them in, they are essential services under the First Amendment of the Constitution. So they should be compared to other essential services, which as the Supreme Court identified in Brooklyn diocese includes, for example, large retail stores, factories, transportation facilities, and in the concurrence of that decision, bike shops are still open, marijuana dispensaries in California are open, liquor stores are still open. So no, it's not appropriate to say churches need to be placed with sports arenas or music halls. You need to look at all the comparators, and if Costco is open, Your Honor, churches need to be open. That's basically the message, loud and clear, from the United States Supreme Court in Brooklyn diocese, and that was recognized when that case was sent back to the Second Circuit recently in the Akita Israel case. When arguments were made, well, we have the scientific categories and distinctions between churches being more like a large crowd attending a movie theater or something like that. What the Second Circuit said is the declarations produced by the state in that case did not purport, and I'm quoting, did not purport to assess the transmission risk of religious worship based on any data, much less to compare religious worship with quote-unquote essential activities. They did not explain how the governor arrived at the specific numerical and percentage capacity limitations in that order, and we're dealing with the same situation here, Your Honor, and the same arguments were made. Well, are we dealing with the same situation here? I mean, you have offered a declaration from, I believe it's Dr. Delgado, that attempts to compare worship services to other facilities. The state has provided quite a volume of medical and scientific expert declarations that try to wind their way through that minefield. I'm not sure that I've seen anything comparable discussed in any other case, which leads me to actually a question. There is a question here. I'm trying to figure out how we make that comparison, and I note that in your reply brief, you cite, I think it's from the Sixth Circuit case. I confess they were together after a while, so I'd have to check my notes, but talking about, I jotted down a quotation, whether the secular conduct endangers these interests in a similar or greater degree than religious conduct does, and it's my sense that you're citing that favorably as the standard we should apply. Is that the case? Well, Your Honor, I think the question, again, was answered by the Supreme Court in Brooklyn. Well, yeah, let me stop you there, because yes, there is that answer, but that basically says, okay, we're in a data-free zone, because nothing in the Supreme Court's decision reflected an attempt to evaluate data, which we have in front of us. That may be that it's found wanting, but we do have information that attempts to compare. The state has offered it up by trying to say, look, our regulations can survive strict scrutiny because they're narrowly tailored, so I'm trying to figure out, okay, tailored by what measure, and is it the measure that you pointed us to in the Sixth Circuit decision? I believe the Sixth Circuit decision may be Robert's v. Deese, Your Honor, but I believe, again, the answer to the question is there are scientists on both sides. We had distinguished scientists presenting five declarations when this went to the district court under the renewed motion for a preliminary injunction. Those are in the record. She struck the ones that were submitted most recently, but the same five experts, including epidemiologists, including Dr. Bhattacharya from there's plenty of evidence there that people can't attend church services socially distanced and wearing masks as well as anyone else engaged in secular activities, be it large crowds in bus terminals or train stations or, again, large retail big box stores. You did submit such evidence but the district court was apparently not persuaded by the evidence. Have you identified any of the findings of the district court that failed the clearly erroneous test? I believe so, Your Honor, for one thing, saying that California is different from New York, Southern California, because it's warmer and people can attend church outdoors. I mean, it's in the 30s and 40 degrees oftentimes in the morning, so that's one fact we would certainly dispute, and we would agree with what the Second Circuit said and what the majority per curiam in Brooklyn diocese when they basically dismissed these very same arguments were made by the state of New York and they were echoed in the dissenting opinions of Justices Breyer and Sotomayor and Kagan, where they went through the same factor, the same transmission risk analysis as the state of California, talking about the size of the crowd indoors and the duration indoors and the vocalization indoors and different families. All that was laid out in the briefs filed by New York and restated by the dissent, but the majority was not persuaded. I'm trying to give you an opportunity to focus on the case we have in front of us and identify what it is you think makes the district court's decision to deny your application and abuse the discretion based on fairly erroneous findings of fact, and to tell me that in a different case the Supreme Court reached a different conclusion, that may carry the day someday, but I'm not sure it really helps you very much dealing with the case that I've got in front of me. I just said, Your Honor, we did point out, for example, the real clear science study that showed in 17,000 churches where a million people attended in the United States that they only had five documented cases of people later testing positive for COVID-19 and did not transmit those to anyone else, and that's when people are wearing masks and socially distancing. The state's so-called scientific data that we have to look at, Your Honor, by comparison in the record are isolated anecdotal newspaper accounts, many involving other countries early on in the pandemic, February and March, where people were not wearing masks and socially distancing, and even those in the United States over the last 10 months they cited where there were infections reported in even accepting that at face value. We've had tens of millions of people in the United States attending church services over the last 10 months because not all states are closed down like California. Most are not, and the transmission risk over that period has shown that it's no greater than it is in any other type of activity where people gather. In fact, Your Honor, if it's so bad in California, as the state will tell you, you certainly cannot lay it on the have been pretty much closed down for most of all the last 10 months. What about the opinions of the experts, Dr. Watt and Dr. Rutherford, in this case, who have, I don't think you questioned their qualifications, but they definitely opine that worship services are, houses of worship services do present a greater risk if you include the seven factor, if you apply the seven factor analysis that the state did. As the United States Supreme Court said in the Gonzales case that we cited on page 56 of the when you're talking about constitutionally protected rights, like the free exercise of religion, which is the first right in the first amendment, which should be no big surprise because the country was founded, as the court knows, by religious refugees who came here braving all perils. Half of them died the first winter, but religious liberty was so important to them that it was made paramount over these other interests. And Your Honor, we have put in scientific evidence. We put in a study of 10 million people. One of the most recent studies which showed that there was a very rare incidence of asymptomatic transmission, which is a big buckaboo here that the state is saying that people can be transmitted this virus. And both the CDC of the United States and in Europe have said there's no hard science to back that up. So you can't take away people's religious liberty based upon inconclusive and even speculative information. Just submitting a declaration... Mr. LaMandri, am I saying this correctly? You're saying that the Great Barrington Declaration is superior science to what the district court judges? I don't believe this court is in a position or needs to make that decision, Your Honor. All I'm saying is the state's evidence is certainly not undisputed, but I don't think this case turns upon which evidence is undisputed because, again, that same evidence was before the United States Supreme Court. And they basically said even during a pandemic... No, but it wasn't the same. Well, we put in our reply the same factors, the seven or eight factors that they have in the Brooklyn Diocese case where they went through those same factors and said we need to defer to the experts. And in that case, there was actually amicus briefs of the American Medical Association as well as the New York Medical Association and declarations of the public health officials in New York. That was not sufficient to persuade the majority in the Brooklyn Diocese case that you could take away people's constitutional rights because they said if you have these comparators open, including, again, retail stores, bike shops, marijuana dispensaries in California, but they mentioned even transportation, you cannot treat churches less favorably because they're the only ones in that group that have First Amendment constitutional protection. This case simply cannot be distinguished from Brooklyn Diocese or from Calvary Chapel, for that matter, based upon the so-called transmission risk factor, which has no studies actually finding that churches are more dangerous than any other place that people act responsibly. And as was said by, I believe it was Justice Gorsuch, and actually this was stated in Augustus Israel and the Robert Spenese case of both the Second and Sixth Circuits quoted this, I believe it was from Justice Kavanaugh, but said what the governor can't do is assume the worst when people go to worship, but assume the best when they go to work or go about the rest of their daily lives in permitted social settings. Here, appellants have in fact made clear that they would follow generally applicable public health regulations, which, Your Honors, is exactly what my client has done. They have had not one reported incident of anybody testing positive for COVID-19 after attending one of their religious services, so they've proven that it could be done safely. And putting people outside in parking lots in cold morning weather instead of allowing them to do what people are doing in large retail shopping at Nordstrom, going about their merry way in temperature-controlled buildings, it simply cannot be justified, the United States Supreme Court said in the Brooklyn Diocese case, using the comparators that they used. I believe my time is about up, Your Honors, with respect to the amount of time I wanted to allocate for the initial portion of my argument, so unless you have additional questions, I'd like to reserve the rest of the time. Mr. Kowarski? Yes, thank you. I'm sorry, Mr. Kowarski, we're having difficulty hearing you. You're sounding a little garbled. I apologize. When you were closer, it was better. How about now, Your Honor? I'm losing much of what you're saying. I'm not sure what the solution is, but that's the reality. Would it help if I called in? Again, I apologize. And I'll start by addressing the question. Not hearing. Yeah, we have a problem. So, do you have a microphone? Can you plug it and unplug it? Yeah, I can use headphones. I apologize. I'll use the headphones. That will be better. Hi, hello, hi. Is that better now? Much better. May I have the balance of the time, if I may, I request for that back? Yes, you may. The court should affirm the district court's denial of a preliminary injunction, and I'll start my presentation by addressing the court's question to opposing counsel about the standard, and the standard that Judge Clifton had read actually comes from the Supreme Court's decision in 1993 in the Churchill-Lukumi case, whereby it found that government discriminates against religion where the government fails to prohibit non-religious conduct that endangers the government's interests with similar or greater degree than the religious conduct would. So, in this circumstance, that means if the state leaves unprotected secular activity threatening to spread COVID or spread the virus in a similar or greater degree than worship services, then that would constitute discrimination, and the state's record that was developed on remand demonstrates that's absolutely not the case, that the state has developed objective and neutral principles to form a comprehensive regulatory scheme that regulates all activities, secular and religious alike, and mitigates the risk appropriately and proportionately in all those that pose an exceptionally high risk of COVID spread, like concerts, like spectator sporting events, like worship services, are subject to the same restrictions. Other activities that also pose a great risk are treated the same or more stringently than worship services, restaurants, gyms, even under the regional stay-at-home order, nail salons, barber shops, acupuncture, laundromats open to the public are all shut down indoors or outdoors, and the state doesn't seem to present evidence demonstrating otherwise. To address some of the comparators that plaintiffs have raised throughout this litigation and raised today, again, many of those comparators are subject to various restrictions, including capacity limits. Council, let me just inject this question. I see their argument as they're asking to be treated in exactly the same manner as the essential critical infrastructure that the state has identified, particularly the entertainment category and the transportation category, and they're not being treated that way, right? Yes, Your Honor. However, those categories are additional restrictions beyond capacity limits that houses of worship are not subject to. For example, in the entertainment industry or professional sports, the state mandates that in those industries there be regular, frequent, weekly, almost daily testing among the cast and crew of a film set, for example, or athletes on sports teams. Plaintiffs aren't suggesting that those stringent testing requirements be imposed on religious congregants. Indeed, it's those tailored restrictions, for example, the frequent testing requirement in entertainment or sports, that mitigate the particular risk posed in those circumstances. It is not true that having a film set poses a risk of outbreak or in a greater degree than would worship services. I think most apparently it's because of that testing requirement. Right, but who imposes the testing requirement? It's not the state. It's the industry. I believe I read a declaration by the California film industry representative who said, you know, all those restrictions on entertainment are because of an agreement between the labor and the producers. That's true, your honor. However, those agreements have been incorporated into the state's mandatory guidance. So the mandatory guidance for the entertainment industry, for example, refers back to those binding labor agreements and said, if you want to operate a film set or other entertainment production, you have to abide by all the restrictions that are outlined in those binding labor agreements. Other of the comparators that are included in the critical infrastructure list, many of them involve workplaces or places of employment, which are subject to additional restrictions that houses of worship aren't subject to when they conduct worship services. So, for example, anytime any employee, whether at a factory, whether at a law firm, is exposed to the virus, the employer must report that exposure to all the other employees. And so that makes contact tracing, quarantining, mitigating the spread much easier. Factories, which is another proposed comparator identified by plaintiffs, in addition to all those employment requirements, must re-retrofit their factories to impose additional precautions, collecting glass barriers between factory employees. I understand that in plaintiffs, I believe it was in their reply brief, included a photograph of a factory. That photograph was taken before the pandemic. So none of the engineering controls would have been in place. And I think the factory employees were wearing masks, again, not because it was during the pandemic, but for whatever reason, that photograph was from before the pandemic. The comparative risk in all these and the restrictions imposed that mitigate the comparative risk in all these other industries have been discussed by our experts. Our experts, Dr. Watt, Dr. Rutherford, almost painstakingly go by industry by industry, sector by sector, activity by activity, and explain why those activities pose a lesser risk and why the additional restrictions imposed by the state on those activities lower the risk. So again, it does not pose a transmission risk to the same or greater degree than worship services. I'll draw the court's attention. This is Dr. Rutherford's declaration, paragraphs 113 through 133. That's in Supplemental Excerpts of Record 975 and the pages that follow. Dr. Watt engages in a similar exercise, paragraphs 102 through 105, beginning at Supplemental Excerpts of Record 714. So we haven't heard plaintiffs under their own standard that they allude to from the Sixth Circuit case, which again comes from the Supreme Court's ruling in Lukumi, haven't identified any secular activity that as it is allowed to operate today under the regional stay-at-home order or even under Tier 1 of the blueprint would pose a similar or greater risk of COVID transmission. To address plaintiff's counsel's comments about Roman Catholic diocese and this court's ruling in Calvary Chapel, Dayton Valley. To be clear, what the Supreme Court found in Roman Catholic diocese was that New York's restrictions did not meet the minimum standard of neutrality as set forth in Lukumi. The Supreme Court did not engage in the sector-by-sector, activity-by-activity risk comparative exercise that the state has provided evidence for and Lukumi requires. Rather, the Supreme Court found that there was discrimination from New York because New York had severely restricted houses of worship but failed to entirely impose restrictions on a whole, you know, a really broad range of secular activities. This is in the red zones that house of worship in New York were subject to a 10-person cap. Essential businesses had no cap at all and no restrictions at all. Yellow zones, 25-person cap for houses of worship. Even non-essential businesses in New York were permitted without restriction. So it was this really wide gulf between the owner's restrictions on houses of on a broad range of secular activities posing a broad range of risk transmission that the court found that it doesn't even meet the standard of neutrality. And that's why the court didn't engage in this sector-by-sector comparative risk analysis. Another reason why the court didn't engage in that in the comparative risk analysis is because that evidence wasn't presented to the court by New York. As plaintiff's counsel has indicated today and in their reply brief, all New York had presented to the court were generalized opinions about generally the riskiness of worship services. There was no evidence, again, nowhere near the detail and copious nature of the state's evidence going point by point saying grocery shopping, here's why grocery shopping poses the less risk under generally accepted epidemiological principles. And as for narrow tailoring and strict scrutiny, New York didn't even attempt to argue that before the Supreme Court. Least restrictive alternative or narrow tailoring, those phrases didn't even appear in New York's briefing. And certainly they didn't provide any the severely harsh restrictions that singled out worship services while leaving unrestricted whole host of secular activities were narrowly tailored as a least restrictive alternative. Mr. Bielanski, can I ask you a somewhat related question? The appellants suggested the standard of review for a district court decision regarding a preliminary injunction with First Amendment implications is de novo. And in your brief, you were saying that it's abuse of discretion. What do you say about their position that we're reviewing the district judge de novo? And when you answer, remember I'm a district judge. Well, Your Honor, the district court made a host of factual findings, I agree, which are entitled to a higher standard of review, clear error or abuse of discretion. So for example, the district court found as a matter of fact that there were outbreaks tied to worship services in California, including through the fall and into the winter. And that plaintiff didn't rebut or take issue with those examples. The district court also found that there was no evidence in the record of any outbreaks in any other industry, specifically job sites, places of employment, or some of the other proposed comparators that plaintiffs identify. Indeed, the only... And so those findings like that are entitled to abuse of discretion. In addition, findings and facts about narrow tailoring, specifically the district court found that in the past, the state had attempted to impose less restrictive alternative. Beginning in May, the state loosened the restrictions and put a 25% or 100 person cap, allowing indoor worship services throughout the state. That was followed by a spike in infections and hospitalizations and deaths throughout the summer. And the district court found as a matter of fact, that alternative was insufficient to curb the spread of COVID and to prevent outbreaks. So those findings, in fact, are entitled to a deferential review standard. Turning back to Calvary Chapel, Dayton Valley, similar to Roman Catholic diocese, there was this, again, wide gulf between the onerous restrictions on houses of worship. In Nevada, it was 50 persons indoor and outdoor, whereas a broad range of categories, casinos, gyms, restaurants, bars, fitness facilities, breweries, distilleries were subject to a 50% cap, which as we know in places like Nevada, a large casino, that can mean thousands and thousands of people gathered together. So it was that really wide gulf between the onerous restrictions on worship services and really permissive restrictions for a whole host of secular activities that led the court to find discrimination. And I'll note that in California, nearly all of the restrictions that Nevada identified, again, gyms, restaurants, bars, casinos, California does not regulate, but nearly all of those activities are outright prohibited under the regional stay-at-home order and are certainly receiving a more stringent capacity limit under the blueprint. Nevada, Calvary Chapel, Dayton Valley did identify retail, but there's no indication that the application of strict scrutiny and the finding of discrimination in that case was solely based on retail. And indeed, California restricts retail more stringently, certainly than New York did, which again, there was no restriction, but also more stringently than Nevada did. At present, under the regional stay-at-home order, retail is subject to a 20% cap and grocery stores are subject to a 35% cap. And our... Excuse me, on this percentage cap thing, I think under... We're looking at both the blueprint and the regional orders, right? So we do have the 100 person cap before us. Do we not? Well, your honor, I believe plaintiffs in San Diego County, putting aside the regional stay-at-home order, would be under tier one of the blueprint. So indoor worship would still be prohibited in tier one in San Diego. Okay, but it seemed to me that the Supreme Court in Roman Catholic Diocese approved a tying of a restriction to the capacity of the church. I guess what I'm asking you is, if we were to apply strict scrutiny here, wouldn't the ordinance be more narrowly tailored if California approached it in the same way as it approaches retail stores by having a percentage of people allowed in tied to the church? No, your honor, it would not. And the evidence demonstrates why that's the case. Our experts unequivocally opine that in regions, under the regional stay-at-home order or the blueprint, where the virus is so widespread and hospitals are so impacted that any amount of indoor worship, regardless of the size of the building, regardless as to whether a mass or distancing or increased sanitization, any amount of indoor worship services simply poses too great a risk of COVID spread. I think that's a very extreme position. What if you were to allow five people in there or ten people and no more than, I don't know, the church's issue seems very large, very vast. And whatever we were to rule on this would apply across California. We recognize that. But surely there must be some number of people where it's not posing such a huge drastic risk. Your honor, I understand that, but respectfully, this is an extreme situation that the state finds itself in, especially right now, given the surge. And unfortunately, we're going by what the experts have opined about, that in these really impacted, struggling counties, regardless of the size of the building, indoor worship services simply poses too greater risk. Masking, distancing, sanitization are insufficient to mitigate that risk. And that's a direct quote from Dr. Watt's testimony. Dr. Watt's testimony at paragraph 99. And Dr. Rutherford corroborates that, paragraphs 101 through 106 and paragraph 75. And Dr. Soto also corroborates that in his testimony and declaration as well. And this is what the district court found. Again, the district found that when the state permitted indoor worship and required mitigating precautions like masking or like distancing, that was insufficient to curb the spread. Plaintiffs, and I'll note that plaintiffs aren't arguing that they should just be allowed to hold five-person worship services, you know, distance 50 feet apart in their large sanctuary. Rather, what plaintiffs alternative that they're proposing, that they presented to the district court, and that the district court made findings about was unlimited numbers of worship services, I suppose, solely capped to the fire code capacity. So plaintiffs aren't arguing that, you know, a five-person cap would be sufficient. What they are arguing are unlimited, you know, worship services of unlimited size. And to turn back to Roman... But our task is to deal with the narrowly tailored argument. And so it's not all or nothing. We have to ask, well, the state prohibition on indoor worship, is that really the best that can be offered when compared with... And I guess we've been talking about grocery stores and retail malls. I made my way through the declarations. I don't pretend that I understood everything that was discussed in the declarations, but they didn't hand me an MD when I left school. Is it really the case, I mean, that the evidence of outbreaks from places of worship appear to be more anecdotal than scientific? That may be just kind of where we are in an evolving situation. But is zero the best that can be offered up for indoor worship? Is that really narrowly tailored? Your Honor, unfortunately, that's what the experts opine, that in these highly impacted counties, indoor worship may not take place and plaintiffs don't rebut that scientific evidence. And I'll note that in the Supreme Court, the Supreme Court did find that it may be the case that there are, you know, percentage caps could be less restrictive alternatives. But again, the Supreme Court didn't have the evidence that the Supreme Court instructed the state to produce on remand when it remanded the Harvest Rock case after Roman Catholic diocese. So the Supreme Court, I think the language that in the Perkh term opinion was, it's hard to believe that capacity caps wouldn't be sufficient. Unfortunately, that's what the state's evidence that the Supreme Court did not have before it confirmed, that capacity limits are insufficient to curb the spread in these really highly impacted counties. And the state's experience earlier in the pandemic also corroborates that. And that's what the district court in South Bay and also the district court in the Harvest Rock matter found as well, that unfortunately, this is the least restrictive mean alternative to shut down indoor worship in these highly impacted counties. Grocery stores and retail stores are permitted indoors, subject to percentage cap and other alternative restrictions that beyond the percentage cap, because the transmission risk is less than in large indoor gatherings. And the state's experts confirm that they explain why, you know, when shopping in retail stores or grocery stores, interactions among patrons is fleeting and transitory, not enough for the amount of infected particles to overcome one's immune system so that transmission of the virus is achieved. Fomite transmission, which is transmission through touching of objects, is exceedingly rare in this virus. And that's not me saying it, that's what the state's experts have opined. So the issue about touching different objects throughout a store, that doesn't pose a great risk. And that's not how this virus transmits in the vast majority of instances. The way that transmits, and this is how the state's restrictions are tailored, the way that it transmits is person-to-person contact. And that transmission is far more likely to occur when people are seated next to each other for an extended period of time in the same general proximity as they are in indoor congregate activities, like concerts, like lectures, and like worship services. Just to couple points that opposing counsel had raised, suggesting that Dr. Delgado's declaration engages in this comparative risk analysis, that is not supported by the record. And the district court earlier in this litigation rejected Dr. Delgado's testimony outright, described it as of minimal weight, would likely not satisfy the Daubert standard, and rejected it, you know, almost outright. And plaintiffs didn't, in their appeal of that ruling, didn't call into question the specific proposed errors in the district court's findings. In addition, the district court didn't rely on plaintiffs' other experts at all, didn't consider them, probably because those experts did not, unlike the state, engage in that activity by activity, sector by sector comparative risk analysis. Dr. Bhattacharya generally states that worship, it might be safe to hold indoor worship services. He does not explain why worship services are safer than, for example, going to the grocery store at the 35% cap, or going to a retail store at the appropriate cap, depending on the tier. And I'll note that we discussed this in our brief, but in situations where there might be medical or scientific uncertainty, substantial deference, not wholesale deference, but substantial deference is warranted to the government's politically accountable public health officials who are making decisions, you know, even if there is some medical or scientific uncertainty. And this principle has been applied for over 100 years. It does not stem from the Jacobson versus Massachusetts case. It is not applied only in cases of emergency. It applies in a non-emergency context, even in contexts where individual liberties are at stake. And we've cited the case law plaintiffs have no response to that. I'll note that the majority of the Supreme Court, even in Roman Catholic, signed on to this principle of substantial, not wholesale, but substantial deference. Justice Kavanaugh, in his concurring opinion, signed on to it. Also, Justice Kavanaugh reiterated that principle in Andino versus Middleton, a Supreme Court case also dealing with the COVID pandemic. With the remainder of my time, we'd just like to address the balance of equity, which plaintiffs characterize in their reply brief as an irrelevant inquiry. That simply is not true. It is one of the mandatory elements for plaintiffs to receive a preliminary injunction. That plaintiffs have the burden of demonstrating whatever harm that they are suffering. And the state concedes that there is some harm by plaintiffs being able to worship indoors. That harm outweighs the great harm that the state would suffer and great harm to the public interest. It's quite remarkable that they dismissed it in that way, especially given the really harrowing, grim surge of infections, hospitalizations, and deaths that are occurring right now. In San Diego, where Plaintiff's Church is located, there is no ICU availability. And that's not just for COVID, you know, serious COVID infections that also affect heart attacks, car accidents, other serious illnesses and injury that impact the public as well. As we discussed earlier, the state has presented unrebutted evidence of outbreaks tied to churches and other houses of worship throughout California, including churches in San Diego very close to Plaintiff's own church. And our experts rely on their outbreaks, and they Dr. Rutherford's declaration, for example, paragraph 37, discusses these super spreader events and large outbreaks. So simply right now, there couldn't be a worse time to enjoin the state's restrictions. And I wasn't sure where we were with the snafu of the headphones, but appears I'm out of time. I'm happy to answer any additional questions from the court, if the court wishes. Thank you, counsel. I guess we will hear from Mr. Michalowski next. Yes. Jeff Michalowski, your honor, and good afternoon. I'm here on behalf of the county. And I can be quite brief, as the county agrees with the state's position. And we're having trouble hearing you. Is this any better? That's better. Okay. Let's try it again. The county joins in and agrees with the state's position in its entirety. The county's order is really a mirror image of the state's guidance. It follows it exactly. Since May of 2020, the county's order hasn't even mentioned religious services and doesn't independently regulate them. What it does is it incorporates the state's industry guidance. So the county's argument tracks the state's argument in all respects. So there's just one additional point that I wanted to raise, which is that the focus of this case is very squarely on the First Amendment and the First Amendment case law. Plaintiffs do have a California Constitution claim as well, but the district court didn't rule on that. It focused only on the First Amendment issue. And that's what happened back in May as we went through this process before. The Ninth Circuit didn't address it and the Supreme Court didn't either. And that's how it should be here. There is no ruling. There is nothing for the court to review with respect to the California Constitution. But if the court does consider the constitutional claim, the county is asserting an Eleventh Amendment immunity, just like the state did. Plaintiffs argued in their reply that counties don't get Eleventh Amendment immunity and that's just for Porter v. Gore, 354 F. Sub. F. Sub. 3rd, 1162, 2018 decision. And what Judge Curiel says is that when a locality incorporates a state rule or a state law and a plaintiff sues the local official, it's really a veiled attack on the state. So the local official will also be entitled to unless there are any questions. I have nothing further. All right. Thank you very much, counsel. Mr. LeMandri, is there some of your time? I hope I'm pronouncing that correctly. You tell me. Thank you. I wanted to point out one last time with regard to what was in the record before the Supreme Court. The Brooklyn Diocese referred specifically to Judge Sotomayor's which was joined in by Justice Kagan and much of the same information was in Justice Breyer's dissent. They specifically noted from the declaration of the Director of Division of Epidemiology at New York Department of Health in the brief of the American Medical Association that what was particularly at risk and made churches more riskier than other secular activities in their view, in their medical opinions, were large groups of people gathering, speaking, singing, close proximity indoors, extended periods of time, and unlike other things that they mentioned in terms of the risk factors, bike shops, liquor stores, they're not as risky. That analysis was before the Supreme Court. The very same analysis the state is putting before the court here. All we have are the naked opinions without any data to support it. And it's not up to state epidemiologists. I understand. They want to do anything they can to stop a particular infection, whatever it might be. They don't consider the constitutional implications. The founders put that job in your capable hands, Your Honors, because you stand as a breach between the people and the government and officials when constitutional rights like this are at issue. And there absolutely is no scientific data showing that churches are more risky when they practice the protocol. None of the anecdotal reports they cited were people wearing masks and socially distancing. In my client's church, they've actually removed every other rosary. There has to be socially distancing. They actually do temperature checks. They make people reserve in advance to make sure they have no symptoms. Now, this can be done and is being done safely in are basically kept out of their churches, is rather respectfully farcical. As the United States Supreme Court indicated, at the very least, you should consider tying it to capacity of the building itself, which they do in the yellow zone where they allow churches to get to 50%. Unfortunately, the churches have never been out of the red zone, which has a 25% capacity for 100 people, whichever is left. And in Los Angeles at this time, Your Honors, as you pointed out in our brief after we won an injunction for our client, Father Berkman, who has churches both in San Diego and Los Angeles, Los Angeles says they're going to follow the Supreme Court precedent and all the churches are now open in Los Angeles with social distancing and wearing masks. The statistics in Los Angeles, which is, as you know, the largest percentage population of the country, the worst for COVID there. In San Diego, they've been running around 80% capacity for both hospitals and ICU beds. So when council says they're at zero in San Diego, our checking the stats every day say that's not true. We filed their briefs as though it's at 78%. Now they're running closer to 80%. But yet San Diego is shut out of their churches entirely. So saying, oh, it's so extreme now, we heard that. So we put in a reply brief, an article from three years ago, January 2018. They said the flu epidemic was so bad, worse than a decade up and down the state. They had tents in parking lots of hospitals for triage. The people under 65 were dying in this very serious situation. We didn't shut the churches down then. And that situation doesn't even exist now. In fact, we now know, and this is undisputed, that COVID-19, for 99.8% of the people below 70, it's not considered fatal. And for people over 70, 98.7% it's not considered fatal. But yet they say it's narrowly tailored to shut down all the churches. It's certainly not. I'm not sure how the first point leads to the second. Well, those sound to me like two entirely different subjects. I'm pointing in context because they're making it sound like the situation is so bad now it's desperate. Really that goes to whether it's compelling government purpose, which is part of the leukemia factors that you look at. It's not as compelling now as it was in March. We're not saying it's not serious. Well, the Supreme Court in the Roman Catholic Diocese case, seemed to close that one. Stemming the spread of COVID-19 is unquestionably of a compelling interest. I don't know that that's on the table. And frankly, the numbers in California seem to have gotten worse since then. I think our focus needs to be on the narrow tailored part. And I don't see how your argument about maybe COVID's not that bad helps you at all with regard to the narrow tailored issue. I just want to put it in perspective because it's no worse in California, statistically, than New York. And when Nevada argued last month, they said they were worse than California. So the statistics say we have to- They're not. The only state worse than California right now is Arizona. But yet we've shown that California has the worst restrictions of the country other than Hawaii. And these statistics do fluctuate in terms of who's worse. In Clouds Air Breeze, California apparently was number 40 in terms of the worst statistics. But regardless as long as secular businesses are open, they cannot justify shutting down the churches on this record. And because constitutional rights are at issue, we cited the United States- Well, that's what I want you to focus on. And I'd like you to focus on what part of the record you think makes the case that you've just argued. I mean, so far I've heard a lot of generalities. I did try to struggle through the declaration submitted by the state. I did look at Dr. Delgado's declaration, although the district court said it didn't pass Talbert. So maybe I shouldn't have, but I did. What do you point us to to make the case that you're arguing that the state's regulations are not narrowly tailored? They're not narrowly tailored because they're shutting people out of churches entirely instead of at least considering capacity gaps as recommended by the United States Supreme Court. And the data's not there. Dr. Delgado said, and I think this is common sense, right? When people walk back and forth in grocery store aisles, they're really not designed for social distancing. We don't need an expert to tell us that. But yet the churches do space people out. In my church, I actually have yellow tape. So you can't go in every other aisle and you can't go past the side of one of the pews. So there is a way to keep people socially distanced in church that simply does not exist in other places where they're walking back and forth, like large retail stores or bus stations. So that part of the record, I think in and of itself, speaks for itself, Your Honor. And besides that, they do not have any real scientific data implicating churches. And for whatever reason, the district court did not consider the other four eminently well-qualified experts, including former CDC experts that we put before the court. And the Old Dominion case, the United States Supreme Court, that we cited on page 45 of our brief, this is a standard of review when such constitutional rights are an issue that generally require an examination of the entire record. Mr. Lomandri, I just have a question. I think you misstated the state of the L.A. County Ordinance. I don't think it's the case any longer in L.A. County that we can worship indoors in churches. Your Honor, I know for a fact it is, because they're representing a church in Los Angeles County, and their lawyers contacted us yesterday, and they're negotiating to let that church worship indoors, wearing masks, and social distancing, along with all the other churches. So I know for a fact that it is a situation in L.A. County. Now, the state's order is still in effect, but L.A. County said they're not going to enforce it, and it's not being enforced in San Bernardino County either. But it is being enforced in San Diego County, even though that same injunction that barred L.A. from enforcing it, which they're honoring, San Diego is not honoring, even though, again, the hospital capacity in San Diego is much better than it is in Los Angeles. So what we're asking for is what's happening in Los Angeles, and what is recommended by the Center for Disease Control, giving due deference to constitutional considerations, which the state and its experts, the scientists, did graduate with a law degree, just like we didn't graduate medical degrees. And it's the court's job to say, I understand what you're trying to accomplish. There is a narrower, tailored way, and indeed, the least restrictive means is masks, and socially distancing, sanitation protocols, and ventilation. And when that is done, churches are certainly at least as safe as any other place. If anything, they can be more well-regulated because they have ushers there, they have a minister, as opposed to other places. The United States... And what evidence do you cite for that proposition? That's what I'm trying to get to. Thank you, Your Honor. For the purposes of my own clients, their church has been open, and they have not had one infection. And so it's hard to Well, I can tell you, that's a data point, but not one that really can be investigated. So I understand that the state declarations are perhaps more theoretical than we want, but that's kind of the reality of the circumstance we're in. What can you point me to that justifies concluding that the district court's finding was clearly erroneous? Well, certainly saying that it's always warm in Southern California, and even in the winter, you can put people outdoors to worship when people who build churches because they consider them sacred places, in many cases, hollow ground, and in many cases have to worship indoors by their doctrine, are being shut out of their churches. And as the court said in Brooklyn Diocese, even a minimal restriction on constitutional rights for people to worship is not acceptable. And that's exactly what's going on up and down this state for millions of people, including, of course, Northern California. It's very difficult to worship outdoors if the temperature is in the 30s, as I'm sure that it is. My brother is in Illinois, and they had an outdoor service on Christmas Day. I'm pretty confident the conditions outside of Chicago, Illinois, are worse than they are in San Diego. They are, but I was there with my family this morning. It was in the 40s, and I had a little baby there, and it wasn't comfortable, but we did it. But you know what? We should not have to be treated in a disfavored way, Your Honor. Again, when people are shopping in temperatures... That's the issue, and it's the disfavored issue that we're trying to focus on, and that's why I appreciate any references you can give me to evidence that really speaks to that. I mean, there hasn't been evidence of prejudice. I mean, the Miami case, you got this thing in the background about this is a disfavored faith. There's been no suggestion of that here, so we're just trying to figure out, okay, let's look at what the state's done. Does that reflect some negative treatment? And that's what we're asking for. The United States Supreme Court said you don't need to have specific statements like Governor Cuomo making statements that could have been taken as being prejudicial to the people of the Jewish faith. We did have statements made by Governor Newsom in a press conference that it's basically a high reward and a low risk situation, whereas the implication churches are not high enough reward, which is what Justice Gorsuch said in his concurring opinion of Brooklyn diocese at the end of the day. Basically, the state does not consider what happens in churches as essential as what happens in these secular places. And if it's so bad that people cannot worship indoors in church, then they should probably have to call ahead and order their groceries in advance and have curbside service. You cannot justify keeping people out of churches by the millions in California with only less than 1% to get inside church in some places, whereas retail is open, transportation is open, liquor stores are open, marijuana dispensaries are open, and under the purple tier, they even have personal services are open, but churches are closed. Personal services include tattoo parlors, nail salons, barber shops. How could that not be discriminatory? A lot has been made of the value and the importance of the hymns and the singing and the aerosols that are generated. Isn't that, I mean, that's the basis. That is an issue, your honor, and again, we did a study made by three music institutes and universities that said if people wear masks and they socially distance, they can safely sing in church. Singing is part of a praise and worship service. It's essential to the way our clients conduct their faith, but even one of the studies that the state put in says if people socially distance and wear masks, they should be able to sing. And again, you have Hollywood, people are singing in music productions, television. Well, I think we can watch TV and see people speaking loudly, and certainly one would expect some singing. We saw people in the streets watching and chanting on television with a lot of government officials and sporting events, even though there may be no fans there, certainly they're shouting out calls and huddles, and you have coaches with yelling in locker rooms. Judge Scanlon on the Ninth Circuit pointed that out. So again, you have to treat everybody the same, and it's discriminatory to tell people that if they worship in that way, they're no longer entitled to do so. We are now 10 months into the pandemic, your honors. We're adults for the most thing. Once we leave the house, we get hit by a car. This is a relatively small risk, a serious risk, if you're over 70 and you have comorbidities, to be sure. But for most people, there's no problem with going to church and worshiping safely, as long as you follow the protocols, which people have been doing at my client's church and experiencing no adverse effects in doing so. And it's the state's burden to come up with real science, which they haven't done. We put a real science article in that said there was no risk when they looked at church services in 17,000 churches, a million people, five inadvertent infections that caused no spreading. And by the way, if churches have three or more infections, they have to report it, and the government can run a check that way as well. Again, at my client's church, they take reservations so they know everybody that comes in. So there's ways this can and is being done safely, so the churches don't have to be discriminated against and shut out of church entirely. Again, the arguments being made by the state really are not different from what happened in the Brooklyn Diocese and Calvary Chapel. They have no evidence in the record in this case specifically directed to churches. Again, if there's outbreaks, it's not because of the churches. All right, counsel, I think you're now repeating some of your earlier arguments and well over your time, and we also have a second case. I'm sorry, Your Honor, I thought I had four minutes, but we have four minutes over. Then I will conclude and just ask the court to grant the preliminary injunction that has been asked for by the South Bay Pentecostal Church and Bishop R. Hodges. Thank you very much, Your Honor. All right, thank you very much, counsel. South Bay United Pentecostal Council Church v. Newsom is submitted, and we will take up our next case on the docket today.
judges: Wardlaw, Clifton, Hillman